Nikiforos ZERVOS

v.

S. S. SAM HOUSTON and Waterman
Steamship Corporation, Defendant.

No. 75 Civ. 5293 (HFW).

United States District Court,
S. D. New York.

July 14, 1978.

**594**

John C. Mamoulakis, New York City, for Nikiforos Zervos.

Graubard, Moskowitz, McGoldrick, Dannett & Horowitz, New York City, for Addis Ababa Bank, National Bank of Ethiopia and Solomat, P. L. C.; Jack Weinberg, Steven J. Brill, New York City, of counsel.

Cole & Dietz, New York City, for Van Ekris & Stoett, Inc. and Marine Midland Bank; Albert D. Jordan, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for Waterman Steamship Corp.; R. Glenn Bauer, New York City, of counsel.

## MEMORANDUM DECISION

WERKER, District Judge.

This is an interpleader action to determine the rights of the parties to the proceeds of 150 tons of Ethiopian coffee. Since this suit has been the subject of a prior opinion, *Zervos v. S. S. Sam Houston*, 427 F.Supp. 500 (S.D.N.Y.1976), those facts previously detailed will not be reiterated in this decision which resolves four motions presented by the parties.

Addis Ababa Bank ("Addis Bank"), National Bank of Ethiopia and Solomat, P.L.C. ("Solomat") (collectively the "Ethiopian Parties") move pursuant to Fed.R.Civ.P. 37(b)(2), (c) for an order striking plaintiff Zervos' pleadings and entering a default judgment against him. Defendants Van Ekris & Stoett, Inc. ("Van Ekris"), and Marine Midland Bank ("Marine Midland") seek summary judgment under Fed.R.Civ.P. 56 dismissing all claims asserted against them; Van Ekris also requests leave pursuant to Fed.R.Civ.P. 41(a)(2) to voluntarily discontinue all claims which either it or Marine Midland asserts in this action if its motion for summary judgment is granted. Defendant Waterman Steamship Corporation ("Waterman") moves under Rule 56 for summary judgment against defendant Addis Bank for Waterman's legal expenses, freight, demurrage, and all other sums which may be adjudged against it during the pendency of this suit under two letters of indemnity issued by Addis Bank on September 16, 1975, (the "Addis Agreements") and under two later letters of October 22, 1975 (the "CBI Agreements"). Waterman also requests the court to order Addis Bank to take over Waterman's defense. The Ethiopian Parties cross move under Rule 56 for summary judgment dismissing Waterman's claims under the Addis Agreements and the CBI Agreements.

### The Ethiopian Parties' Motion To Strike Zervos' Pleadings and Enter Judgment By Default

Zervos claims the proceeds of the sale of the coffee based upon an assertion that he, having purchased the original two negotiable bills of lading numbers 1 and 2 for almost one million dollars from Solomon, is a holder in due course of those bills. Specifically, Zervos contends that he paid Solomon approximately $230,000 in cash along with four promissory notes aggregating almost $700,000, payable on December 3, 1975 at the Banque Populaire Suisse in Geneva, as the purchase price for the bills of lading. Because Zervos asserts holder in due course status by virtue of these transactions. The Ethiopian Parties requested that he produce all records of his banking transactions for the period between July 1, 1975 to the date of his deposition. Zervos did not comply, and on February 25, 1977 the Ethiopian

Parties moved for an order compelling him to produce all such records. The motion was granted, and this court entered a disclosure order which provided:

"ORDERED, that Zervos be and he hereby is directed to produce and deliver to the offices of the attorneys for the Ethiopian Parties, at 345 Park Avenue, New York, New York 10022, within 20 days from the date of this order, all books, records, and other writings, including, without limitation, banking statements, debit notes, credit and deposit records, statements relating to transfers of funds from one account to another and cancelled checks, reflecting or relating to transactions during the period from July 1, 1975 to and including July 1, 1976 in each and every bank account in which Zervos has or had an interest, individual or corporate, or over which he has or had power of attorney or other form of control, whether in his own name, or a trade name, or a partnership name, or a corporate name, or in association with others."

Subsequent to entry of the above order, Zervos forwarded to the Ethiopian Parties various documents[1] pertaining to his banking transactions. These included only four balance sheets and two extracts relating to transactions conducted through Banque Populaire Suisse. Of these, the Ethiopian Parties assert that only two documents are relevant to the time period covered by the disclosure order. Additionally, Zervos did not furnish any records that he himself made of his various banking transactions, debit advices, or letters of instruction that payment be made through any of his accounts. Only two credit advices were provided, neither of which related to Zervos' account at Banque Populaire Suisse—the bank through which he allegedly paid the $700,000 in promissory notes to Solomon for the two bills of lading. Dissatisfied with the quantity of items produced and their lack of relevancy, for the most part, to Zervos' purchase of the bills of lading, the Ethiopian Parties presented the court with the instant motion. In answering the motion, Zervos submitted a sworn statement to the court which provides in part that "I have no documents or records in my possession of the kind which the Court ordered me . . . to produce, other than those which I have already produced to the Ethiopian parties."

Under ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in his possession, custody, or control, should resolve the issue of failure of production since one "cannot be required to produce the impossible . . . ." *LaChemise Lacoste v. Alligator Co.*, 60 F.R.D. 164, 172 (D.Del. 1973). In the present instance, although Zervos attests to having none of the requested documents in his "possession," there has been absolutely no showing that the banking records are not within his "control." In his opposing affidavit Zervos nowhere alleges that he has requested the Swiss banks to furnish him with the documents which he has been directed to produce. This is an action which the court will require him to undertake. "Production may be ordered when a party has the legal right to obtain papers, even though he has no copy, and regardless of whether a paper

---

1. Pursuant to the disclosure order Zervos produced the following:

1. Four balance sheets from Banque Populaire Suisse.
2. Two extracts of account from Banque Populaire Suisse.
3. Ten statements of account from Caisse Hypothecaire du Canton de Geneve.
4. Eleven statements of account from Societe Bancaire Barclays (Suisse) S.A. Geneve.
5. One statement of account from Banque Hypothecaire du Canton Geneve.
6. A credit advice for Societe Bancaire Barclays (Suisse) S.A.
7. A credit advice for Union Bank of Switzerland.
8. A statement of account from Banco Pinto & Sotto Mayor of Portugal.
9. Four checks drawn at Swiss Volksbank.
10. Nine memoranda of various transactions from the Caisse Hypothecaire du Canton de Geneve.
11. Six copies from microfilm of checks drawn on the Caisse Hypothecaire du Canton de Geneve.

is beyond the jurisdiction of the court." *Buckley v. Vidal*, 50 F.R.D. 271, 274 (S.D.N.Y.1970); *see also In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D.Ill.1977); 8 C. Wright & A. Miller § 2210, at 621 (1970 ed.). Zervos is therefore ordered to request all internal bank memoranda (including, but not limited to debit advices, credit advices and letters of instruction) of all his banking transactions from July 1, 1975 through July 1, 1976 and to produce such documents by way of copies or otherwise to the Ethiopian Parties. Failing such action within sixty (60) days from the date of entry of this decision, the Ethiopian Parties' motion to strike Zervos' pleadings and enter judgment by default will be granted.

### The Summary Judgment Motions

### I

"Summary judgment is a harsh remedy to be granted only where there are no material issues of fact to be tried." *FLII Moretti Cereali v. Continental Grain Co.*, 563 F.2d 563, 565 (2d Cir. 1977), *citing Judge v. City of Buffalo*, 524 F.2d 1321 (2d Cir. 1975); *see also Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96 (2d Cir. 1970). In deciding a motion for summary judgment, it is not the court's function to try factual issues, but rather to determine whether issues of material fact exist to be tried. *FLII Moretti Cereali v. Continental Grain Co.*, 563 F.2d at 566; *United States v. Bosurgi*, 530 F.2d 1105, 1110 (2d Cir. 1976); *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). In reaching such a determination, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought . . . with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d at 1320.

With the above in mind, I turn to the motion of Van Ekris and Marine Midland who seek dismissal of all claims asserted against them in this action. Although the underlying occurrences are undisputed, I find the evidence subject to conflicting interpretations concerning the manner in which the parties intended Marine Midland and Van Ekris to treat bill of lading 11 and consequently, Marine Midland's letter of credit. For this reason the motion for summary judgment must be denied.

After Addis Bank gave Waterman the two letters of indemnity (the Addis Agreements), for issuance of bills of lading 11 and 14, Waterman's Ethiopian agent Gellatly delivered both bills of lading to Solomat on September 17, 1975. On the same day Addis Bank sent to Marine Midland bill of lading 11 endorsed by Solomat to Addis Bank and by Addis Bank to Marine Midland along with Solomat's draft directing Marine Midland to pay Addis Bank for Solomat's account the sum of $117,488.00, which represented the price of the coffee shipment to be delivered to Van Ekris. In its transmittal letter, Ethiopian Parties' Exh.–CC, Addis Bank stated that it was forwarding the documents on a "collection basis" due to loss of the original bill of lading, and instructed Marine Midland "[i]f unaccepted or unpaid advise us immediately by cable giving reason." On September 18, 1975, Addis Bank advised Van Ekris that Solomat and Addis Bank "HAVE OBTAINED A REPLACEMENT FOR THE STOLEN B/L AND HAVE TODAY AIRMAILED SAME THROUGH MARINE MIDLAND BANK N.Y. STOP YOU MAY THEREFORE CLEAR THE GOODS AGAINST PAYMENT." Ethiopian Parties' Exh.–FF. On the same day, Waterman advised Van Ekris that the New York shipment had arrived and that it would be delivered only upon surrender of bill of lading 11 and Addis Bank's indemnity.

On or about September 19, 1975 Van Ekris effected a clearance of the New York shipment through United States Customs. Subsequently Van Ekris telexed Addis Bank that it would cooperate provided Addis instructed its correspondent bank in New York to issue full indemnification if the original bill of lading appeared. Addis Bank then advised Van Ekris by telex on September 29, 1975 that it would not issue

such a guarantee. Meanwhile, on September 24, 1975 Marine Midland received bill of lading 11 and its accompanying documents. On or about October 2, 1975 Marine Midland endorsed the bill of lading and released it to Van Ekris without making payment to Addis Bank. In its letter to Van Ekris Marine Midland stated that it was "releasing this bill of lading to you free of payment so you may obtain clearance of the merchandise. When this has been accomplished, please inform us by telephone so we may effect payment of $117,488.00" Ethiopian Parties' Exh.–MM. Van Ekris then endorsed bill of lading 11 and delivered it to Waterman with a delivery order requesting the latter to deliver to Van Ekris' customer, Hills Brothers Coffee, Inc. Waterman retained the fully endorsed bill of lading 11 and Hills Brothers' check but refused delivery of the coffee on October 2, 1975. According to Van Ekris, on that same day it received a cable from Addis Bank which in pertinent part indicated that as soon as arrangements were completed with the shipping companies, Addis Bank would authorize Van Ekris' bank to release any documents against Van Ekris' undertaking to "EFFECT PAYMENT IMMEDIATELY AFTER YOU CLEAR GOODS." Reply Brief for Van Ekris and Marine Midland at 11 & n. 5. Following these occurrences, Van Ekris telephoned Waterman on October 3 and demanded to know why Waterman had refused delivery of the coffee. Van Ekris also sought return of bill of lading 11 which was refused by Waterman at that time. On October 6 Van Ekris telexed Addis Bank to relay Waterman's refusal of delivery, to indicate that Van Ekris was prepared to cooperate fully and pay for the coffee upon physical delivery, and to obtain advice from Addis Bank on how to proceed.

On October 21, Van Ekris telexed Solomat that it feared the buyers of the coffee would cancel their sales contracts unless delivery could be effected immediately. Ethiopian Parties' Exh.–WW. The next day Solomat replied that Addis Bank had given Waterman a strong bank guarantee (namely, that of an American bank), and

Van Ekris should therefore have no difficulty in obtaining delivery. Meanwhile, on October 22, Waterman obtained the CBI Agreement despite prior issuance of the Addis Agreements on September 16, 1975. *See Zervos v. S. S. Sam Houston*, 427 F.Supp. at 502–03. Thereafter on October 23 Waterman tendered delivery to Van Ekris who refused to accept it. On October 27, see Ethiopian Parties' Exh.–YY, Van Ekris advised Solomat that it was cancelling its contracts due to Solomat's inability to deliver.

Subsequently Marine Midland telexed Addis Bank on November 3 that it was still awaiting the buyer's approval of discrepancies in the documentary remittance. See Ethiopian Parties' Exh.–ZZ. Again on November 26 Marine Midland telexed Addis Bank seeking indemnity for any damage Marine Midland might incur in making payment under bill of lading number 11. See Ethiopian Parties' Exh.–AAA. In the interim, Van Ekris telexed Solomat on November 17 offering to buy the coffee shipment at a reduced rate. See Ethiopian Parties' Exh.–BBB.

■ Upon a review of these facts, I find a genuine material issue as to the intent of the parties concerning the manner in which they desired to treat bill of lading 11: whether the Ethiopian Parties intended, through the September 18, 1975 and October 2, 1975 telexes from Addis Bank to Van Ekris, that payment be made by Marine Midland under its letter of credit for Van Ekris only if physical delivery of the goods covered by the bill of lading could be obtained. This appears to be both Marine Midland and Van Ekris' understanding, although the Ethiopian Parties argue, despite the Addis Bank telex of September 18 to "clear the goods against payment," that no such payment arrangement was ever intended. To the contrary, the Ethiopian Parties now assert that the conduct of Marine Midland and Van Ekris was wrongful, and that payment under the letter of credit should have been made in the usual manner, *i. e.*, prior to or contemporaneously with delivery to Van Ekris of the bill of

lading. However, in light of the peculiar circumstances surrounding this action, reasonable men might differ in interpreting the parties' expectations of each other as derived from the various communications and deposition testimony submitted to the court as exhibits, and in deciding whether the conduct of Marine Midland and Van Ekris was impliedly authorized by the Ethiopian Parties. Similarly, the reasonableness of Marine Midland and Van Ekris' subsequent conduct under all the circumstances presented is an issue which must remain for the fact finder. This is one of those "instances where summary judgment is too blunt a weapon with which to win the day, particularly where so many complicated issues of fact must be resolved in order to deal adequately with difficult questions of law which remain in the case." *Miller v. General Outdoor Advertising Co.,* 337 F.2d 944, 948 (2d Cir. 1964). The motion of Marine Midland and Van Ekris is accordingly denied.

Waterman moves for summary judgment under the Addis Agreements and CBI Agreements; the Ethiopian Parties cross-move to dismiss Waterman's claims under both agreements. Many of the facts surrounding these motions are extensively detailed in my earlier opinion, 427 F.Supp. at 501–06, and require no repetition here. Briefly, in that opinion I found that the CBI Agreements were issued without consideration and therefore that Waterman was not entitled to summary judgment based on its claim under those agreements. 427 F.Supp. at 504–06. In the present motion Waterman once again contends that there was sufficient consideration for the CBI Agreements. Since this position has already been argued by Waterman and rejected by the court it will not be reconsidered here. Waterman also presents a new

contention, *i. e.,* that even if the CBI Agreement were issued without consideration, they were modifications of the September 16, 1975 Addis Agreements, and, as such, required no consideration under N.Y.Gen. Oblig.Law § 5–1103[2] since they were in writing and signed by Addis Bank. To support this argument Waterman notes that the Addis Agreements and the CBI Agreements refer to the same subject matter and the same bills of lading, that communications between the parties reveal that Waterman required an additional indemnity from a major United States bank to back up the Addis Agreements, and that Addis Bank agreed to this new term as part of its indemnity agreement.

Apparently on September 21 and 23, 1975, Waterman received telexes from its agents stating that Addis Bank wanted Waterman to agree that the coffee would be delivered only to holders of bills of lading 11 and 14. Waterman Exh.-I1 & I2. Waterman replied through its agents to Addis Bank that it would require a letter of credit to be opened with a major United States bank to cover the guarantee given by Addis Bank and Solomat as shipper. Waterman Exh.-J. After learning that bills of lading 1 and 2 were being held in Switzerland by Nydigger Transport Corporation and United Overseas Bank of Geneva respectively, Waterman once again telexed its agent Gellatly to instruct Addis Bank and the shipper not to negotiate bills of lading 11 and 14 until true ownership was ascertained. In that telex it also indicated that Addis Bank and the shipper would be required to post a bond or open up a letter of credit with a major American bank. According to Frederick Sevekow, Jr., Waterman's vice president and general counsel, Waterman stated that if this were

---

2. N.Y.Gen.Oblig.Law § 5–1103 (McKinney 1978) provides:

   *Written agreement for modification or discharge*

   An agreement, promise or undertaking to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such contract, obligation, lease, mortgage or security interest, shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent.

not done promptly, it would require the return of bills of lading 11 and 14. Sevekow affid. at 11–12. Waterman later telexed Addis Bank directly to inform it of Waterman's requirements of the American bank guarantee and the return of bills of lading 11 and 14 before Waterman would release the cargo to Van Ekris. Waterman Exh.–K. In the interim, Addis Bank telexed CBI that a bank guarantee or letter of credit, whichever was applicable, should be issued to Waterman. Waterman Exh.–L. On September 25, Waterman was contacted by Zervos who stated that he had bill of lading 1 and wanted to take delivery of the coffee in New York. Waterman then notified Addis Bank of this by telex and also stated that unless bills of lading 11 and 14 were returned and American security posted, Waterman would refer the matter to an American court for adjudication. Waterman Exh.–M. On the same day CBI notified Waterman that it had received authority to issue the guarantee. Then, on September 26, Addis Bank telexed Waterman that Addis Bank had given CBI "FULL AUTHORITY TO DISCUSS TERMS OF DOCUMENTS YOU REQUIRE TO ENSURE DELIVERY OF GOODS TO RIGHTFUL BUYERS I. E. VAN EKRIS STOETT INC. AND LONRAY INC." Waterman Exh.–N. Thereafter, on October 2, 1975 Addis Bank again telexed Waterman explaining that Zervos was informed of the circumstances under which bills of lading 1 and 2 had been stolen and stating "AT ANY RATE YOU SHOULD BE FULLY SECURED BY BANK GUARANTEE WHICH WILL BE ISSUED IN YOUR FAVOUR BY CONTINENTAL BANK INTERNATIONAL NY." Waterman Exh.–P. Waterman telexed Addis Bank in part that "WE CONFIRM THAT WE ARE PREPARED TO DELIVER CARGO TO YOUR PURCHASERS UPON RECEIPT OF U. S. BANK GUARANTEE." Waterman Exh.–Q.

Frederick Sevekow, Jr., asserts in his sworn affidavit that when Van Ekris sent Waterman bill of lading 11, the coffee was not delivered because the CBI guarantee had not yet been received. Sevekow affid.

at 15. The following day, after Zervos formally demanded delivery of the coffee, Waterman sent Addis Bank two telexes revealing Zervos' demand, Waterman Exh.–R1, and later discussing the amount of the guarantee demanded by Waterman. Waterman Exh.–R2. On October 4 Addis Bank telexed Waterman that arrangements were being made for issuance of the required guarantee, Waterman Exh.–S, and on October 8 Addis Bank telexed Waterman advising that an Addis Bank officer was being sent to New York to finalize the terms of the bank guarantee. Waterman Exh.–T.

On October 20, Zervos advised Waterman that he was in New York to take delivery of the coffee. Sevekow met with Zervos and his attorney and the following day telexed Addis Bank, stating in pertinent part that "UNLESS WE RECEIVE U. S. BANK GUARANTEE TODAY, ZERVOS MAY SUCCEED IN ATTACHING OR FORCING DELIVERY OF CARGO." Waterman Exh.–V. Two days later the guarantees were presented to Sevekow, who accepted them for Waterman.

Despite the content of the above communications, the Ethiopian Parties contend that the CBI Agreements were never intended as modifications of the Addis Agreements. Among other items, they point to various cable texts that they sent to Van Ekris (some of which are quoted under the discussion of the motion of Van Ekris and Marine Midland) as evidence of their intent not to modify the Addis Agreements but instead to hold Waterman to its obligation under the Addis Agreements to deliver the coffee to Van Ekris, without further guarantees, on October 2, 1975. They therefore argue that the Addis Agreements on September 17, 1975 constituted the full agreement between the parties and that subsequent actions which culminated in the signing of the CBI Agreements were in no way meant to modify the Addis Agreements. They further contend that since no modification occurred, Waterman's actions constituted a breach of the Addis Agreements which now precludes Waterman from any recovery that it seeks.

On this motion (as with the Van Ekris and Marine Midland motion discussed above), although the facts are undisputed, Waterman requests the court to discern whether the parties intended the CBI Agreements to constitute a modification of the Addis Agreements. Based on the foregoing detailed events, telexes, exhibits, affidavits and memoranda of law submitted to the court, I conclude that "the evidence presented . . . is subject to conflicting interpretations," 10 C. Wright & A. Miller § 2725, at 515 concerning the parties' intent, and that summary judgment in this instance is therefore improper. Whether the CBI Agreements were intended to modify Waterman's obligations under the Addis Agreements, and hence whether Waterman acted properly and is entitled to recovery under either or both of the agreements, or conversely whether Waterman is precluded from indemnity under the Addis Agreements by its refusal to tender delivery until receipt of the CBI guarantees, are issues which must await trial on the merits.

Because of this determination, I find it unnecessary to consider the host of other arguments advanced by the Ethiopian Parties and Waterman.

In accordance with the above, the Ethiopian Parties' motion to strike Zervos' pleadings and enter judgment by default is granted unless Zervos complies with the requirements of this decision within 60 days; the motion for summary judgment of Van Ekris and Marine Midland is denied, as are the summary judgment motions of Waterman and the Ethiopian Parties.

SO ORDERED.